Okay. Whenever you're ready, Counsel. Good morning, Your Honors. Franny Forsman appearing on behalf of Tara Mazzeo. I would like to focus on the plain error issue with regard to the jury instruction on willfulness. The — following the Olano analysis of plain error, I'd go through the three elements and address each. The first is, was there an error? And that's been conceded. It was conceded before the U.S. Supreme Court by the Solicitor General. It's been conceded in the brief in this case. It's been conceded and accepted by the Ninth Circuit in the panel in Ajuko that the — and I'll read from the unpublished opinion in Ajuko on remand in which the panel at this panel in 2014 said, as conceded by the governor in his opposition brief to Ajuko's petition for certiorari, the district court erred by giving an instruction on the element of willfulness that does not comply with Bryan v. United States. And that's where the law in the Ninth Circuit got off track, was Bryan — the U.S. Supreme Court decision in 1998 was very clear about what the definition of willfully is. And the Bryan court said, the jury must find that the defendant acted with an evil-meaning mind. That is to say that he acted with knowledge that his conduct was unlawful. Later in Titoian, Bryan was not referenced by this Court. And that's how he sort of fell off the track. Alitoson Well, I — yeah. I mean, I'm with you on this. But I guess I've been — I'm inclined to think the government's right that we're not able to say that this error is plain right now just based on their concession in this GBR in Ajuko. But in other words, there needs to be some published decision from our court. Blatt Your Honor, I tried to find a case in a similar posture that would define clear as something other than a published opinion, and frankly, I could not. But I don't know that you're restricted to a published decision in order to be able to find that the error is clear. Would — it seems that the interest of justice would not be served by the simple fact that the panel chose not to publish its decision in Ajuko. They made the decision. The government's argument was until this circuit accepts the government's argument, then we're bound by bad law that we've decided is erroneous and that you can't do it unless you do it en banc. Alitoson Yeah. But we've said, certainly, that we're not bound by any government concession, even on a point of law. It's ultimately our — it's — you know, we are the only people that have authority to actually say, okay, the law has now changed. The government can't just say, oh, well, we decided that — Blatt I agree with that. I certainly — I would not agree with that. Alitoson Right. Right. Blatt I just want to say that. How can you take the position, well, when it benefits me, though, then the — Blatt Because the panel in Ajuko did exactly that. The panel — the panel — not the GBR, not the brief of the Solicitor General. Alitoson I've looked at that little thing, and it's not very helpful. And I know you were hoping that they were going to publish, but it — Blatt They did accept the government's argument. It's clear that they accepted the government's argument. It's clear that they didn't rely on old, bad law, and that they relied upon their determination based upon the fact that it was undisputed, that the instruction was wrong, and they reversed that case and remanded. And the government said in its brief, if the — if the circuit accepts the government's argument, that we can't move forward on this unless the circuit accepts the government's argument, which it did. Well, I mean, what the government said is that you must go en banc to resolve this. And it seems to me the same question arises for our panel now. I guess — Blatt Wouldn't that be true in Ajuko, though? Because — because it wouldn't — wouldn't — couldn't — could the panel in Ajuko reverse absent going en banc? They decided that they could. Alitoson Well, but there wasn't — they didn't have Titoyan. I mean, we've got a decision that directly construes 1001. In Ajuko, there was no prior circuit authority that had construed 1035. That was why they were — had a little bit more freedom than I think our panel does. Blatt They did, except for I think that the law is very clear in the cases that 1001 and 1035 are construed identically. So — Alitoson I agree. But I'm saying we've got right now, as things stand, when you're standing right here, we have a binding three-judge panel decision in Titoyan that has not been overruled. And I don't think just because the government comes in and says, well, you know what, we think that decision from — when was Titoyan, 2000? The decision from how, you know, 14 years ago, well, we think it's wrong. So — Blatt It's actually 2007. Alitoson Okay, seven years ago. Sorry. Blatt Yes. Alitoson Well, it just, you know, we've decided that it's wrong. And so that frees you — I mean, what you're saying is that, well, that frees you as another three-judge panel just to disregard prior circuit precedent? I don't think that's the way it works. Blatt I think that you could determine that it's clear, that Titoyan is wrong, and you could determine that the error is clear and apply it to this case, as I say, just as the panel did in Adjuko. They were addressing a different statute, but those statutes had been construed identically, and certainly the panel didn't make that distinction in determining that they could apply the correct law to that case and reverse it and remand. If this panel does determine that it requires an en banc decision, then obviously what I would request is that this Court, this panel, say we would do something absent the fact that we can't do anything absent going en banc. Alitoson I mean, we could call it en banc sua sponte. That's certainly an option. And I assume that if you — if what you're — if we were to conclude that we're otherwise bound by Titoyan, that is what you would urge us to do. Blatt That's exactly — that's exactly what we would request, Your Honor. I think that the interests of justice, which obviously is one of the factors to be determined in a plain error case, are not served by saying that we know that we're wrong, but we're going to apply the wrong standard to this instructional error and have the result for taramizeo be based upon what we know already is wrong. And so we would request that if the issue is that this panel feels bound by Titoyan, which didn't cite Bryan, that's the problem, is that it — it — the — Bryan is so clear — I went back and reread it this morning — it is so clear on it, and that's exactly what the Solicitor General told the United States Supreme Court. The — let me just maybe go through the — the remaining factors if we — if we're able to get beyond plain error. The effects of substantial rights — this is — the interesting contrast between this case and Ajupo is that in Ajupo there actually were certifications which included language about this is — it's unlawful to make false statements on medical device applications, that kind of thing. In our case, there were no such certifications. We had this informal, in the bathroom, with the dogs in the house, questioning that was not recorded, and even the government must concede that under the overwhelming evidence standard that is sometimes applied in plain error cases, that it — that can't be met in this case in terms of — on this element of the crime. The prosecutor asked — I think I've cited in my briefs three different times — asked the agent to try to elicit what admonitions did you give Ms. Mizeo? What — what did you ask her? What did you tell her about talking to you and — and was not able to elicit from the agent that anyone told her that — that lying to a Federal agent is a — is a felony? I think sometimes our — we Federal practitioners think, well, everybody knows that. Well, Justice Ginsburg suggested that maybe in these informal situations that everybody doesn't know that. So I see that I have a minute 49 left. I'd like to reserve that for rebuttal. Thank you, Your Honor. Very good. We'll hear from the government. Good morning. May it please the Court. I'm Elizabeth White for the United States. Good morning, counsel. So there's two — three issues with Adjoku. First of all, as Your Honor mentioned, Adjoku was interpreting 18 U.S.C. 1035, a false statement in the context of a health care or something. And — and there is no current binding precedent interpreting the willfulness element with respect to that statute. There is current binding precedent with respect to 1001. Now, as the government said on remand, when — when the Supreme Court remanded this case to this Court for reconsideration, Adjoku, in light of the government's concession, the government said, okay, technically the Court wouldn't have to go in bank to accept the Solicitor General's interpretation of the statute with respect to 1035. But the one thing that we all agree on is that 1035 and 1001 should be interpreted the same. It's essentially the same language. To the extent that the Solicitor General made the concession in the Supreme Court, he said this should apply to 1001 instead. And so what we said was the problem is, is that you've got binding precedent, and a panel cannot overturn the interpretation with respect to 1001. So we respectfully suggest that you go in bank so that the full Court can decide whether to adopt the Solicitor General's interpretation of the statute and change current binding precedent. The panel in Adjoku declined that suggestion, which, of course, they're entitled to do. But what that means is that there is current binding precedent in this Court. And are you urging making the same thing that your colleagues from the Central District of California did in Adjoku? The government would urge the Court to resolve this issue because it's creating confusion in the district courts. But the problem here is, is that I don't think it's an appropriate to go in bank in this case, because in this case, an in-bank decision cannot help this defendant. This is on plain error. And the second prong of plain error is that the error has to be plain at the time of appeal. And here we are. It's appeal. Here you are. If we sat en banc and clarified that, in fact, de Toyin was wrong, why wouldn't she, why wouldn't this defendant be able to take advantage of that ruling? My understanding of the second prong, I could, and I admit I have not researched this, my understanding of the second prong is that the error cannot be determined to be clear and obvious in your case. Okay. What authority do you have for that proposition? And I would be happy to follow up with a letter. I don't have a case at my fingertips. I do believe that that is the interpretation of the second prong of plain error in the circuit. If you have authority that says that, I think you should submit it in a letter brief, because that seems to me a key issue. Absolutely. I can't see why. I mean, if a few months ago that Adjuko three-judge panel, or let's just say that the court there had gone en banc. Yes. And, you know, let's say the decision came down yesterday. I mean, why does it matter if it's in her case or someone else's case? It seems an odd line to draw. And as I say, and I will follow up with the 28-J, and if I'm wrong on that, I'll let you know that. I mean, that's my understanding of the second prong is that it has to be plain. Okay. If you're wrong on that, though, then would you urge us to take this case online? Yes. Yes. Because as we said, in Adjuko, the Ninth Circuit model jury instruction folks have already revised the Ninth Circuit model jury instruction to include this extra requirement for the government to prove knowledge, to prove that the defendant knew that making the false statement was unlawful. And we're asking district courts to include that, even though the current binding law in this circuit, so it's creating some confusion in the district court, and I think it would be helpful to clarify that. I think that if I'm right that this defendant cannot benefit from a finding in her own case that the error is plain and obvious, then it wouldn't be appropriate for this Court to go and bank, because that would essentially be an advisory opinion if it doesn't create a case or controversy in this case. But as I say, yes, if I'm wrong on that, then we would urge the Court, as we did in Adjuko, because there is confusion. But I do want to say one thing with respect to this idea of fairness, that somehow that if she only misses out by a day or a week or somehow, the law draws lines. And in particular, when the law changes, anytime the law changes, there is a line about who gets to benefit from that change and who doesn't. And the closer you are to that line, the more it feels like it's unfair that you're on the side that doesn't get to benefit. And, you know, I was thinking how many defendants had their criminal convictions become final the week before the United States Supreme Court issued the Booker decision or two weeks before, and how many of those defendants might have benefited if the Court had issued that decision one week earlier or two weeks earlier. But if you're going to say, oh, you only missed that cutoff by one week, so it will give you relief, all that does is move the line back. Now the people who were two weeks ago are saying, well, wait, I only missed the grace period by one week. I know. But from a fairness standpoint, let's say you were the defendant, right? And I'm just saying, the defendant is sitting here saying, you know what, the government is saying that there was this defect in my trial. I'm a convicted felon now. And, you know, I mean, if she can meet the other elements of the plenary test, maybe she's entitled to a new trial with a properly instructed jury. It seems odd for us to say, well, you know what, we actually agree with you, but it's just your case isn't important enough. We're just going to wait for another case to finally clarify. And that's and I don't think that the decision should be made that the case isn't important enough. What I'm saying is, is that if the rules, I mean, to any individual defendant who ends up on the short side of the stick, it's going to seem unfair. What I'm saying is if there is a line that needs to be drawn and that line needs to be drawn consistently, that's where the fairness is. And, of course, any particular defendant is going to feel like they, you know, that they got the short end of that stick, but that doesn't make the line drawing unfair. That's just how the law works. That's what that's essentially my point. So I do think, yes, obviously, this question, which was not addressed in either of our supplemental briefs about the second prong, yes, if Ms. Mazzeo, if a finding in this case adopting the Solicitor General's interpretation of this statute and overruling Tattoian could be of benefit, you know, would meet the second prong in this case for this defendant, then this Court should do that, and then we can move on to the third and the fourth and decide whether a new trial is warranted. You know, which we, if you get to that third prong, so I'll just go ahead and move to that. If you get to that third prong, the question is whether there's a reasonable possibility of another result under the third prong. And, you know, and there was evidence from which the jury could have inferred from which the government could have argued to the jury if we thought it was necessary to do so. Roberts. That she knew that lying to these agents was a Federal crime and that she intended to break that law when she gave the false answer? Yeah. I mean, like, as I say, there's evidence from which that inference could be drawn, but what this Court has said with respect to third prong, most of the cases really talk about whether overwhelming evidence, you know, whether there's any reasonable possibility, and they've really only rejected the third prong if there's no way, you know, and this doesn't fall in that. And we conceded that this doesn't fall in that. This strikes me as the classic case where you'd want this kind of instruction. I mean, wasn't the defendant standing in her bathrobe talking to these agents? Yes, she was. And they're trying to, you know, hey, we're your friend. We're here to help. Well, that's if you, I mean, the jury had two exceedingly, I mean, just irreconcilable stories about what happened that day. The two agents testified. The defendant and her mother testified that the mother was there, first of all. The agent said the mother wasn't even there. The agent said that they talked to her outside for a few seconds, and then she brought them into the casita. The mother said, no, no, we stood out there for ten minutes, and they harassed her. They alternately said, you know, we're your friend, you should trust us, and then harassed her and said that if the mother went into the room, she'd be charged with a, you know, with obstructing a federal investigation. You know, this is a classic case, and you don't, you actually don't see this stark kind of case where credibility of the witnesses is so fundamentally important because somebody was telling the truth and somebody wasn't. I mean, this was, you know, this was not a case where, well, they could have just been interpreting the same set of facts differently. I mean, either the mother was there or she wasn't there. And so, you know, and either, I suppose the thing about stickering and, I mean, the sort of, all of that stuff, which the mother and daughter were so in line with. I mean, the little, the little asides and the little stories that they told about the agent's snickering when she said this and that. I mean, both the mother and daughter said that. So this was a case where the jury was called to decide who was telling the truth and who wasn't. And they, and where there was an opportunity with respect to the mortgage on the house. I mean, it is true that that testimony was a little bit, you know, do you, did you buy your house? I mean, I would say I bought my house, even though, in fact, the bank has the property at my house. And so, you know, so to the extent that there's something that's open for interpretation, the jury appropriately gave her the benefit of the doubt. She was acquitted on count two. But where you had just irreconcilable stories that came down to credibility, the jury clearly believed the agents and did not believe the defendant and her mother. I see I'm out of time, unless you have other questions. No. Thank you. And I will send that letter. Okay. Thanks very much. We'll give you two minutes, or, yeah, that's a perfect one. There is line drawing. Some of my practice in the past has been habeas work, and there's very clear line drawing in terms of what, when a law is applicable. And the line drawing is on direct appeal. If we were on some, at some other stage of the proceedings, it would be a completely different argument. But as is discussed in both Johnson v. U.S., 1997 case, and Henderson v. U.S. Supreme Court cases that address the fact that it is at the time of appellate consideration that the error is assessed. And in both of those cases, now, I will say that in Henderson, they were applying an intervening decision in Johnson that actually abrogated a prior Supreme Court precedent by saying, no, you can look at this while this is up on direct appeal. You can look at the error, and if you determine that it's an error at the time of appeal, as long as it's still on direct appeal, then you have met the time limit and the line drawing has been done. Just to comment on the factual issue with regard to the third prong in Olano, the fact of the matter is, is that the lead agent who was doing the questioning who was called in the case in chief testified repeatedly that he couldn't even tell you exactly what questions he was asking. He could give you a general idea of the questions. We've got an issue in there with regard to the notes because of that problem, because there was no recordation, there was no verbatim statement, there was no verbatim recitation of what questions were asked, what responses were given. And so that's what left the credibility issue open. And we suggest that the credibility issue has to be determined by a jury with a properly instructed jury. Thank you for your time, Your Honor. Thank you. All right. And just one note. I mean, I know you would do it anyway, but if the government does file a 28-J letter or whatever we're going to call it with authorities saying that your client can't take advantage of this ruling, of course, please respond. I absolutely will. Okay. Thank you. Great. Thanks very much for your arguments this morning. The case just argued will stand submitted.
judges: Martinez, Gould, Watford